```
 1                      UNITED STATES DISTRICT COURT
                       EASTERN DISTRICT OF MICHIGAN
 2                          SOUTHERN DIVISION

 3    UNITED STATES OF AMERICA,

 4               Plaintiff,
                                         HONORABLE PAUL D. BORMAN
 5
        v.                               No. 13-20243
 6
      D-1 ANDREW PARTYKA,
 7
                 Defendant.
 8    _____/

 9

10               MOTION TO WITHDRAW AS COUNSEL/SENTENCING

11                     Friday, January 24, 2014

12                          9:00 a.m.

13

      APPEARANCES:
14
          For the Plaintiff:        CYNTHIA J. OBERG
15                                  U.S. Attorney's Office
                                    211 W. Fort Street
16                                  Suite 2001
                                    Detroit, Michigan  48226
17                                  (313) 226-9100

18
          For the Defendant:        STEVEN F. FISHMAN
19                                  615 Griswold
                                    Suite 1125
20                                  Detroit, Michigan  48226
                                    (313) 962-4090
21
                                    ANDREW PARTYKA, Pro Se
22

23

24           To Obtain Certified Transcript, Contact:
             Leann S. Lizza, CSR-3746, RPR, CRR, RMR
25                          (313) 965-7510
```

| | | |
|---|---|---|
| 1 | | **TABLE OF CONTENTS** |

Page

Motion to withdraw as counsel                    3

Sentencing                                       7


Exhibits:                                  Received

  (None offered.)

MOTION TO WITHDRAW AS COUNSEL

| | |
|---|---|
| 1 | January 24, 2014 |
| 2 | Detroit, Michigan |
| 3 | -   -   - |
| 4 | (Call to order of the Court, 9:00 a.m.) |
| 5 | (Court, Counsel and Defendant present.) |
| 6 | THE COURT CLERK:  Now calling the case of the *United* |
| 7 | *States of America versus Andrew Partyka*, Case Number 13-20243. |
| 8 | THE COURT:  Okay.  Parties please identify themselves |
| 9 | for the record beginning with the government. |
| 10 | MS. OBERG:  Good morning, Your Honor.  Cynthia Oberg |
| 11 | appearing on behalf of the United States. |
| 12 | THE COURT:  And seated with you at counsel table for |
| 13 | the record, please. |
| 14 | MS. OBERG:  Is Special Agent Christine Taylor from the |
| 15 | FBI. |
| 16 | THE COURT:  Okay.  Good morning. |
| 17 | Okay.  And for Defendant, please. |
| 18 | MR. FISHMAN:  Steven Fishman, for now, on behalf of |
| 19 | Mr. Partyka, and he's sitting at the table. |
| 20 | THE COURT:  Okay.  And good morning, Mr. Partyka. |
| 21 | THE DEFENDANT:  Good morning, Your Honor. |
| 22 | THE COURT:  Okay.  Have a seat for a minute.  Let me |
| 23 | just... |
| 24 | Mr. Fishman, why don't you and Mr. Partyka come to the |
| 25 | podium.  Ms. Oberg, why don't you go side bar and let's |

1    begin -- you can come up to the podium, sir, with the motion to

2    withdraw as counsel.

3          Have you all had any further conversations since the

4    motion was filed?

5          MR. FISHMAN:  We've -- not about continuing on the

6    case.  We've had a little bit of e-mailing, just Mr. Partyka

7    asking me certain procedural questions.  For instance, I had to

8    e-mail him, tell him it was adjourned from yesterday afternoon,

9    but we haven't changed our position.

10          THE COURT:  Okay.  I received Mr. Partyka's sentencing

11   memorandum.  The government got a copy?

12          MS. OBERG:  Yes, we did.

13          MR. FISHMAN:  I should say that, Judge, I did that as

14   well.  I think either Ms. Oberg -- somebody asked me to file it

15   on the ECF system, so I had them send it to me and everybody

16   should have a copy.  It's part of the system.  It wasn't my

17   memo, but I filed it out of the courtesy for everybody.

18          THE COURT:  Okay.  So at any rate, we do have that.

19          Let me ask you, Mr. Partyka, Mr. Fishman has been your

20   counsel up till now, and I think you're very aware that he's an

21   excellent lawyer and very knowledgeable about the law and this

22   courthouse.  Is it your desire to proceed to have him withdraw

23   and to proceed by yourself without an attorney?

24          THE DEFENDANT:  Yes, Your Honor, for sentence.

25          THE COURT:  Okay.  Let me explain some things that are

1    required with regard to someone who wants to represent himself.

2    You have a constitutional right to self-representation, but I

3    want to make clear that you're aware of the hazards and

4    disadvantages of self-representation.

5              Have you ever studied law?

6              THE DEFENDANT:  No, sir.  But I'm aware of the fool-

7    for-a-client quote.

8              THE COURT:  A what?  You know, that's a maxim or -- I

9    guess the point is this:  The law is complicated with regard to

10   sentencing.  Your sentencing memorandum indicates an

11   understanding of some aspects of the sentencing guidelines, in

12   particular, the amounts of loss and how that factors into the

13   guideline range, and you wrote about it very well.  But at the

14   same time if you represent yourself, you're on your own.  I

15   cannot advise you on the law.  You understand that?

16             THE DEFENDANT:  I understand, Your Honor.

17             THE COURT:  Okay.  And I must advise you, in my

18   opinion, a trained lawyer would represent you, in particular,

19   Mr. Fishman, who's an excellent lawyer, better than you could

20   defend yourself, and I think it is unwise for you to represent

21   yourself.  At a sentencing you're entitled to allocution which

22   is a fancy way of saying to speak.  But you're not familiar

23   with the law, and Mr. Fishman could highlight, if you wanted

24   him to, the legal -- some of the legal issues relating to

25   sentencing guidelines, departures, variances and other matters

```
 1    like that.  You understand that?

 2              THE DEFENDANT:  Yes, Your Honor.

 3              THE COURT:  Okay.  In light of the difficulties of

 4    representing yourself, do you still desire to represent

 5    yourself and give up your right to be represented by a lawyer?

 6              THE DEFENDANT:  Yes, Your Honor.

 7              THE COURT:  Okay.  Is your decision entirely

 8    voluntary?

 9              THE DEFENDANT:  Yes, Your Honor.

10              THE COURT:  Is there anything that you want to state,

11    Mr. Fishman?

12              MR. FISHMAN:  No.  I laid everything out for the Court

13    in the motion.  I tried to be as detailed as possible.

14              THE COURT:  Right.

15              MR. FISHMAN:  And I should tell you, Mr. Partyka asked

16    me certain questions today about just the procedure.  I advised

17    him as to how the sentencing hearing goes on, so I think he's

18    fully capable of doing it.

19              THE COURT:  Okay.  I find that Mr. Partyka has

20    knowingly and voluntarily waived the right to counsel.  I'll

21    permit him to represent himself.

22              Let me ask a question and, again, I can't force

23    anything.  Do you want Mr. Fishman to sit at the table during

24    the sentencing in any way to be there if you have a question?

25              THE DEFENDANT:  He doesn't want to, so no, Your Honor.
```

MOTION TO WITHDRAW AS COUNSEL

```
 1          THE COURT:  Okay.  Well, I think generally it's a
 2  conflicting situation and once he's removed, he's removed.
 3          THE DEFENDANT:  Right.  I agree.
 4          THE COURT:  Okay.  You agree to that.
 5          Okay.  Then, Mr. Fishman, I will remove you.
 6          I believe that the record -- let me just ask, Miss
 7  Oberg, are there any voir dire questions with regard to the
 8  self-representation that you want to ask the Defendant.
 9          MS. OBERG:  No, Your Honor.  Thank you.
10          THE COURT:  Okay.  Very good.
11          Thank you, Mr. Fishman.
12          THE DEFENDANT:  Thank you.
13          Thank you, Your Honor.
14          THE COURT:  Then let me proceed then with the
15  sentencing.
16          Miss Oberg, did you receive a copy of the Defendant,
17  Mr. Partyka's sentencing memorandum?
18          MS. OBERG:  Yes, I did.
19          THE COURT:  Okay.  And, Mr. Partyka, did you receive a
20  copy of the government's sentencing memorandum?
21          THE DEFENDANT:  Yes, Your Honor.
22     (Whereupon Mr. Fishman exited the courtroom)
23          THE COURT:  Okay.  Very good.  Then let me ask, as
24  part of the sentencing, under the Victim Witness Protection
25  Act, individuals are entitled to speak, if they wish to, and,
```

```
 1    Miss Oberg, are there any victims that are here, present, that
 2    wish to speak?
 3           MS. OBERG:  Your Honor, Keith Hammer is here
 4    representing, if the Court permits it, his daughter, Jennifer
 5    Harris, who is a victim.  She's in Texas.  He also has brought
 6    a letter from her that we just received today, and he's also
 7    speaking -- or asking to speak on behalf of Shane Daniel,
 8    another victim, who I believe is also in Texas who could not be
 9    here today.
10           THE COURT:  Well, I will allow him to speak on behalf
11    of his daughter.  I will not allow him to speak on behalf of
12    another victim who is not here.
13           Do you have copies of those letters?
14           MS. OBERG:  Mr. Hammer brought them this morning, and
15    I do have copies.
16           THE COURT:  Okay.  If you'd give one to Mr. Partyka
17    and one to Mrs. Tofil for me, and I don't know if you have a
18    third copy.  If not, we can make one after for the probation
19    officer.
20           MS. OBERG:  Thank you.
21           THE COURT:  Just for the record, would the probation
22    officer identify himself.
23           MR. ELY:  Yes, Your Honor.  Steve Ely, last name is
24    E-L-Y, on behalf of the probation department.
25           THE COURT:  Very good.
```

1        So if the individual would come up, forward, to the

2   podium and speak and identify and spell your first name and

3   last name to help Ms. Lizza and, most importantly, speak slowly

4   because Ms. Lizza has to take down every word.  Okay?

5        MR. HAMMER:  Shall do.

6        THE COURT:  Okay.  And your name, sir, is Keith

7   Hammer?

8        MR. HAMMER:  Yes, it is.

9        THE COURT:  Spelled?

10       MR. HAMMER:  K-E-I-T-H.

11       THE COURT:  Okay.

12       MR. HAMMER:  The last name, Hammer, H-A-M-M-E-R.

13       THE COURT:  Thank you.  Please proceed.

14       MR. HAMMER:  Okay.  Thank you.

15       Thank you, Your Honor.

16   First, let me take the opportunity to be here --

17       THE COURT:  See, when people read, they read real

18   fast.

19       MR. HAMMER:  Oh.

20       THE COURT:  Ms. Lizza has to take down every word.

21   Let's do it like this cadence like I am doing, talking right

22   now.

23       MR. HAMMER:  Shall do.

24       First, let me thank you for the opportunity to be here

25   today to address the Court and Andrew, in particular.  I'm here

**SENTENCING**

1    today representing my daughter, Jennifer Harris, her husband,

2    Scott Harris, and their two children, my grandchildren, Chloe

3    and Colton Harris, ages four and 18 months.

4         Both my daughter and her husband are hard-working and

5    upstanding people.  They both work long hours and honest jobs

6    while raising a family so that they can provide shelter, put

7    food on the table, save for college and save for the inevitable

8    rainy day.

9         In addition, they are people of high integrity which

10   makes today hurt that much more.  Scott and Jennifer love their

11   family and are always there to help their friends and others in

12   their community.  In stark contrast, the Defendant, Andrew

13   Partyka, sits here today before this Court and his victims a

14   convicted felon.  Andrew is now an admitted liar, thief and a

15   person absent of integrity and without a conscious (sic).

16   While no crime is excusable, most will agree that sometimes

17   there are mitigating circumstances that lead good and even

18   desperate people to do bad things.  Andrew's crimes have no

19   such mitigating circumstances.

20        Andrew did not steal to save his home.  Andrew did not

21   steal because he was hungry and starving.  Andrew did not steal

22   to cover medical expenses to save a loved one.  No, Andrew

23   stole so that he could live the high life and purchase luxury

24   items while frequently traveling the world in style.  We

25   watched as Andrew purchased and flaunted expensive jewelry and

1    other luxury items, known and unknown.

2         While traveling, Andrew was even bold enough to share

3    his pictures with friends and family, or should I say victims,

4    documenting those high times, from exotic locations around the

5    world.  Andrew was raised in privilege, was provided with

6    opportunity and in the end made a conscious decision to make an

7    illegal living by preying on family, friends and acquaintances.

8         When you ask why Andrew would take this route, I

9    believe there are a few words to answer this question.  Greed,

10   laziness and a total lack of compassion for anyone.

11        My daughter and her husband welcomed Andrew into their

12   home on several occasions, and unfortunately, Andrew benefited

13   from my wife and my hospitality in our home as well.  Over the

14   past year, as Andrew's lies and criminal enterprise imploded,

15   Andrew's victims now know that they never really knew him.

16   Everything about Andrew is a lie and part of a well planned

17   effort to steal money from anyone that he could.  Not only did

18   Andrew lie and deceive family, friends and acquaintances to get

19   their money, the lies became more bold and outrageous in an

20   effort to avoid being caught.  Andrew stole from family,

21   friends and, worst of all, active military personnel.  He stole

22   from the very people that put their life on the line daily to

23   protect him.

24        Further, my daughter was recovering from thyroid

25   cancer when my daughter and my husband first gave Andrew their

1   hard-earned money to invest.  When accepting this money, Andrew

2   knew my daughter was recovering from cancer, and later Andrew

3   even told his victims that he had brain cancer and was in the

4   hospital for lifesaving surgery as things began to unravel.

5        Andrew took money from people that my son-in-law

6   worked with potentially jeopardizing his employment.  Yes,

7   Andrew is personally a person without integrity and without a

8   conscious (sic).

9        My daughter and son-in-law cannot be here today

10  because they decided to spend their money on air fare to come

11  home from Texas for Christmas and are now both working and

12  cannot afford the air fare to be here today.  However, they

13  wanted me to make clear to this Court just how much Andrew has

14  hurt them and his other victims, both financially and

15  emotionally.

16       I hope that I have done so on their behalf.

17       In closing, let me say that while Andrew may not have

18  entered a party store or a bank to steal money, he entered our

19  homes to steal our money.  The unfortunate truth is that we

20  will never know the true negative impact that Andrew's crimes

21  have had on his victims.  Lives may be changed forever due to

22  lack of financial resources and opportunities lost.  People who

23  steal from party stores or banks often steal much less money

24  and are sitting in prison today for -- with very long prison

25  sentences.  While -- why should Andrew's crime be treated any

1   less harshly?

2          We ask Your Honor and this Court to sentence Andrew to

3   the maximum sentence provided by the law and to a prison where

4   he will pay for his crimes.

5          Thank you, Scott and Jennifer Harris.

6          THE COURT:  Thank you, sir.

7          MR. HAMMER:  Thank you, Your Honor.

8          THE COURT:  Okay.  Any others under the victim witness

9   protection?

10          MS. OBERG:  Your Honor, Mr. John McIntyre, who is a

11   victim, is present in court.  He's indicated he doesn't wish to

12   speak to the Court but he did want to attend the sentencing.

13          THE COURT:  Okay.  Very good.  Thank you, sir.

14          Okay.  At this time, Mr. Partyka, why don't you come

15   to the podium.  Miss Oberg, why don't you go side bar.  And

16   we'll proceed.

17          In your memorandum you are challenging, as you pointed

18   out already, the guideline range as contained in the

19   presentence report.  Specifically, the amount of fraud loss in

20   the presentence report is between $400,000 and a million

21   dollars.  Is that correct, Mr. Ely?

22          MR. ELY:  Yes, Your Honor.

23          THE COURT:  And you believe that the amount should be

24   between 200 and $400,000 which would give you a two-level

25   reduction under the base offense level; is that correct?

**SENTENCING**

| | |
|---|---|
| 1 | THE DEFENDANT: Yes, Your Honor. I have -- this is -- |
| 2 | if I may approach, this is the list the government provided my |
| 3 | then counsel in November with the loss. |
| 4 | THE COURT: Right. I think it's attached to -- |
| 5 | THE DEFENDANT: Attachment A, I believe. |
| 6 | THE COURT: Let me just check. |
| 7 | MS. OBERG: It is. It's Attachment A -- the document |
| 8 | that Mr. Partyka has is one that was a working copy. |
| 9 | THE COURT: Right. |
| 10 | MS. OBERG: Submitted in November. The one that the |
| 11 | Court has is the final copy filed in January. |
| 12 | THE COURT: Okay. Let me just -- as I have gone over |
| 13 | and added it up, Mr. Ely, neither of us are math Ph.D.s, but we |
| 14 | get a figure of loss of $363,308. Is that correct, Mr. Ely? |
| 15 | MR. ELY: Yes, Your Honor. |
| 16 | THE COURT: And is that the number, in terms of adding |
| 17 | up with regard to the loss, restitution amount? |
| 18 | THE DEFENDANT: I come up with a range, Your Honor, of |
| 19 | 338,708 to either three seventy-four zero eight. |
| 20 | THE COURT: Okay. |
| 21 | THE DEFENDANT: But for the purpose -- that's |
| 22 | restitution as a separate issue. But the loss amounts, I |
| 23 | guess, then would be below 400,000, correct? |
| 24 | THE COURT: Right. |
| 25 | Do you wish to speak with regard to that, Miss Oberg? |

**SENTENCING**

```
 1              MS. OBERG:  Your Honor, I submit that the loss amount
 2    may be below 400 if we don't include the individuals who have,
 3    since they first were contacted by the FBI, decided that the
 4    money that they gave Mr. Partyka was, in fact, a loan rather
 5    than an investment, for reasons that I don't begin to
 6    understand, but the fraud amount, the amount that he got from
 7    them which the Court can use as the fraud amount for
 8    calculating guidelines, is well over 400,000.  I'd ask the
 9    Court to use that figure.
10              THE DEFENDANT:  Your Honor, it's my understanding and,
11    obviously, I'm not as knowledgeable that to the purpose of the
12    sentencing guidelines, Mr. Ely could maybe clarify, that loss
13    amount not restitution amount is what is used.
14              THE COURT:  Well, I'm going to use the loss amount and
15    I'm going to then say we're in the range of 200,000 to $400,000
16    loss which then creates a advisory guideline range of 30 to 37
17    months.  Is that correct, Mr. Ely?
18              MR. ELY:  Yes, Your Honor.
19              THE COURT:  Okay.  And that then --
20              THE DEFENDANT:  Your Honor?
21              THE COURT:  Yes.
22              THE DEFENDANT:  The victim number would not change
23    then or influence it, right?  Because the range is incon -- it
24    doesn't change the base -- the level amount, correct, Mr. Ely?
25              MR. ELY:  The victim range is 10 to 50 victims, so I
```

**SENTENCING**

```
 1    don't think that is -- that would change.  It would have to be

 2    below ten.

 3              THE COURT:  Right.

 4              MR. ELY:  In order for that to affect the guidelines.

 5              THE COURT:  So we're dealing with an advisory

 6    guideline range of 30 to 37 months.  Are there any other

 7    guideline matters that you wish -- and a restitution amount of

 8    $363,000.

 9              THE DEFENDANT:  Your Honor, I have yet to be provided

10    with the loss list that the government did, so even for the

11    interest of alleged victims, only people that are owed money

12    should be on the list because the working list I had had

13    several individuals who either were not -- for example, the

14    government in November claimed Mike and Grace Naseef were owed

15    $20,000.

16              THE COURT:  You're going to have to spell the last

17    name.

18              THE DEFENDANT:  Naseef, N, as in November, A-S-E-E-F.

19              MS. OBERG:  Maybe I can short-circuit this.

20              THE DEFENDANT:  Okay.  Yeah.

21              MS. OBERG:  Do you have the sentencing memo that I

22    filed?

23              THE DEFENDANT:  I have your sentencing memo without

24    attachments, ma'am.

25              THE COURT:  Okay.  Then let me -- do you have, if
```

```
 1    not -- well, I got writing on it.
 2              MS. OBERG:  Well, I don't know why that would be.
 3              THE COURT:  Huh?
 4              MS. OBERG:  I don't know why that would be.
 5              THE COURT:  Do you have a copy of the government's --
 6    I don't either.  But we can get a copy of it.  Do you have a
 7    copy of it, Mr. Ely?
 8              MR. ELY:  I do not have an extra copy, Your Honor.
 9              MS. OBERG:  I'll give him the copy that I have, Your
10    Honor.
11              THE COURT:  Okay.  And then, Mrs. Tofil, can you go
12    and make a couple copies of that?
13              THE DEFENDANT:  Okay.  But Your Honor --
14              THE COURT:  You all have a seat for a minute while we
15    get copies for everybody and then we'll all be on the same
16    page.
17              THE DEFENDANT:  Thank you, Your Honor.
18        (Short pause.)
19              MS. OBERG:  Your Honor, if that's the case --
20              THE COURT:  Wait till Ms. Tofil gets back.
21              MS. OBERG:  But I wonder if he doesn't have the other
22    attachment either.
23              THE COURT:  Okay.  That's a good question.
24              THE DEFENDANT:  I have --
25              THE COURT:  The victim impact statements by various
```

**SENTENCING**

1    individuals?

2            THE DEFENDANT:  I'm missing one, Anthony Benedosso,

3    Jr., but I have the rest, Your Honor.

4            MS. OBERG:  Should I take these to Ms. Tofil?

5            THE COURT:  Yeah.  Why don't you go back in there

6    and -- so thank you for raising that, Ms. Oberg.

7            MS. OBERG:  Sure.

8        (Short pause.)

9            THE DEFENDANT:  Thank you, Your Honor.

10           THE COURT:  Sure.

11           THE DEFENDANT:  If the Court's going to have a

12   subsequent restitution hearing, a lot of my concerns with this

13   list could be raised then, but if it's in the interest of

14   sentencing that my questions -- my objections be made now, I

15   can make them now.

16           THE COURT:  Okay.  I believe that we've established

17   the loss of amount.  You're speaking about the restitution

18   amount, correct?

19           THE DEFENDANT:  Pardon?

20           THE COURT:  We've established the loss amount.  You're

21   dealing with the restitution amount.

22           THE DEFENDANT:  Well, even on this loss amount there's

23   still further inaccuracies, Your Honor, of what people are owed

24   and so --

25           THE COURT:  Okay.  Then let's divorce that from the

1    restitution.

2              THE DEFENDANT:  Okay.

3              THE COURT:  In other words, we're dealing with a loss

4    amount in the guidelines and maybe we can have a restitution

5    hearing in a couple weeks.

6              THE DEFENDANT:  As my objections on this, Your Honor,

7    don't change the guidelines --

8              THE COURT:  Right.

9              THE DEFENDANT:  -- should I still make my objections

10   known?

11             THE COURT:  No, you can do that --

12             THE DEFENDANT:  At restitution.

13             THE COURT:  -- with regard to restitution at the

14   restitution hearing.  We'll schedule it down the road.

15             THE DEFENDANT:  Thank you, Your Honor.  And then can I

16   move on to the issues I have with the government sentencing

17   memo?

18             THE COURT:  Yes.

19             THE DEFENDANT:  Okay.  I'll just do a page-by-page

20   work-through, if that works for the Court, and make my

21   objections known.

22             Obviously, on the first page of the government's --

23             THE COURT:  Oh, you're speaking too fast.

24             THE DEFENDANT:  Oh, I'm sorry.  I'll talk slower for

25   the Court.

1            THE COURT:  Very good.

2            THE DEFENDANT:  Obviously, the range of 37 to 46

3    months, as we established, is now lower.

4            THE COURT:  Correct.

5            THE DEFENDANT:  I am kind of -- I object to these

6    unstan -- overall with the government's memo I must admit

7    I'm -- there seems to be no evidence, a lot of hearsay and

8    baseless prejudicial allegations that the government inserted

9    as fact.  For example, these allegations --

10            THE COURT:  Well, it's not fact.  It's their position.

11    So it's like their argument and your argument.

12            THE DEFENDANT:  Okay.

13            THE COURT:  Yeah.

14            THE DEFENDANT:  I mean, just the allegations of

15    gambling away, on the second page, Your Honor, the -- a

16    recurring allegation here is that I use this money to travel

17    the world and then the government then says between 2005 and

18    2012 Partyka and his then fiancee, Angela Naseef, traveled the

19    world.

20            THE COURT:  Too fast.  Slowly.

21            THE DEFENDANT:  My apologies, Your Honor.  I didn't

22    know my fiancee until 2008, and prior to this incident well

23    before any range of alleged criminal activity, I traveled the

24    world extensively to approximately 85 countries prior to 2008

25    which I believe the government agreed is well before any

1  criminal activity.  So I'm troubled that the government is just

2  throwing out dates that -- for influencing Your Honor to make

3  the alleged criminal activity seem more far stretched than it

4  is, so I just object on the premise of that.

5       THE COURT:  I will assume for purposes of sentencing

6  that you met Miss Naseef in 2008.  I'll also use the microphone

7  to help Ms. Lizza and the people in the court.

8       THE DEFENDANT:  And also the range of alleged criminal

9  activity has been from 2009 to 2012, 2005 to 2012.  I think

10 undeniably, I can agree that it's 2010, 2012, if the government

11 has no objection to that.

12      MS. OBERG:  I do object.  I think --

13      THE COURT:  Go ahead.

14      MS. OBERG:  The indictment -- well, I'll go with the

15 figures in the indictment, January, 2009, to February, 2013.

16      THE DEFENDANT:  Your Honor, the company they say I

17 used, Rosebud Capital Management --

18      THE COURT:  Wait.  You're speaking too fast.  Rosebud

19 Capital Management.

20      THE DEFENDANT:  -- Capital Management, Your Honor, was

21 incorporated in August of 2009 and no funds were involved in

22 this case until February of 2010.

23      THE COURT:  Okay.  This is not of significance with

24 regard to sentencing.

25      THE DEFENDANT:  I would just like to -- just for your

1    benefit, Your Honor.

2              THE COURT:  Okay.

3              THE DEFENDANT:  On the third page of the government's

4    sentencing memorandum, they say that "Several of the letters

5    indicate a belief that if FBI had not intervened and stopped

6    Partyka in the fall of 2012, he would still be taking money

7    from new victims, gambling it away and taking lavish trips

8    around the world."  My objection to this is that it's purely

9    speculation, and prior to the government's involvement I had

10   repaid almost 20 percent, or well over $100,000, to individuals

11   without soliciting further investment, i.e., a Ponzi scheme.

12   So people might not have been happy with repayment terms or

13   times, but repayment was occurring, nonetheless, and

14   substantially so.

15             On page 4 of the government's sentencing memorandum --

16             THE COURT:  Again, slower, please.

17             THE DEFENDANT:  Yes, sir.  On page 4, Your Honor, the

18   Court -- I mean the government argues that my scheme required

19   me to set up shell corporations and ult --

20             THE COURT:  Really.  Let me just put it this way.  You

21   either slow down or sit down.  You have a right to allocute,

22   but you don't have a right to be disrespectful and -- to the

23   court reporter.

24             THE DEFENDANT:  I apologize.

25             THE COURT:  She has to take down every word.  So this

```
 1    is the fourth time I've mentioned it.  You'll either slow down
 2    or you'll sit down.
 3              THE DEFENDANT:  I'm sorry, Your Honor.
 4              The government alleges that I set up shell
 5    corporations and opened multiple bank accounts to cultivate an
 6    ever-expanding group of potential victims.  I'm unaware of any
 7    shell corporations I've opened, Your Honor, besides the Rosebud
 8    Capital Management that I do not dispute was in existence.  And
 9    in terms of multiple bank accounts, I only had two bank
10    accounts with Bank of America.  So I just feel that's
11    exaggerative and I would like to make that known.
12              MS. OBERG:  Does the Court wish response on that?
13              THE COURT:  No.  I'll give you an opportunity when
14    he's done.
15              MS. OBERG:  Thank you.
16              THE COURT:  You got a legal pad?  If not, we have
17    extras up here.
18              MS. OBERG:  I'm good.  Thanks.
19              THE COURT:  Okay.
20              THE DEFENDANT:  On page 5, Your Honor, of the
21    sentencing memo, the government keeps throwing out an
22    allegation that I showed the victim investors a copy of what
23    appeared to be a $10 million check payable to Rosebud Capital
24    Management.  This never occurred.  I'm unaware of -- I mean,
25    it's almost another serious allegation that I'm forging a
```

1   check, and there's no evidence, Your Honor, that anybody would

2   have, even if this did happen, relied on that to make an

3   investment.

4          I have issue, Your Honor, with many of the claims of

5   the victim impact statements, not their passion but just

6   factual objections.  For example, on page 9 of the government's

7   sentencing memorandum, the government says that Lisa Mascall,

8   M-A-S-C-A-L-L, liquidated her $10,000 IRA and withdrew another

9   $5,000 from her savings account and lost it all to Andrew

10  Partyka's fraud.  The only problem, Your Honor, as I

11  highlighted in my memo, is that Miss Mascall was paid back in

12  full, 100 cents on the dollar, and then further received $2,000

13  trans-Atlantic business class air fare.  So I feel like an

14  omission like that is just troubling but also that the

15  government didn't take the time to check the veracity of many

16  of these sentencing victim impact statements that people made.

17         And I'm unaware how some of these individuals are

18  better informed of my finances than others.  Am I able to make

19  objections to victim impact statements?

20         THE COURT:  Yeah.  You're allowed to speak with regard

21  to that, sure.

22         THE DEFENDANT:  Thank you.

23         May I just have one second to organize my papers?

24         THE COURT:  Yeah.

25      (Short pause.)

**SENTENCING**

```
 1            THE COURT:  Again, slower.

 2            THE DEFENDANT:  Sorry, Your Honor, I'm nervous.  I

 3   apologize.

 4            THE COURT:  I know.  I understand.

 5            THE DEFENDANT:  I want to get this over.

 6            THE COURT:  We'll get done slower and appropriately.

 7            THE DEFENDANT:  So as I just mentioned, Your Honor, I

 8   object to Lisa Mascall's victim impact statement, not her right

 9   to make it but just the factual basis, and she omitted full

10   repayment and then subsequent benefit.

11            I guess this may -- the Court may correct me if this

12   goes into a restitution hearing, but a lot of individuals, as

13   most frauds are obviously messy or sloppy in nature, I wonder

14   if I could argue that people received financial payments or

15   benefits or gifts that would change the amount of what they're

16   owed and, therefore --

17            THE COURT:  We'll deal with that at restitution.

18            THE DEFENDANT:  Okay.

19            THE COURT:  We have a calculated guideline figure.

20            THE DEFENDANT:  Okay.  Thank you, Your Honor.

21            THE COURT:  So we're okay with that and we'll deal

22   with individual restitution matters.

23            THE DEFENDANT:  Okay.  Thank you.  I just didn't know.

24            THE COURT:  Okay.

25            THE DEFENDANT:  My next victim impact statement would
```

1    be Michael Benedosso, B-E-N-E-D-O-S-S-O.

2              THE COURT:  Thank you.

3              THE DEFENDANT:  Mr. Michael Benedosso also failed to

4    mention that he had received 72.66 percent of his money back

5    which is $14,532.  The government has him listed as $10,000

6    invested and fifty-four sixty eight zero.  He had made a loan

7    to me also of $10,000 that wasn't included on this, but that

8    was repaid in full, so I just feel like what is lost on some

9    people is that repayment was underway and has since been frozen

10   as a result of this.

11             My next objection is just highlighting for Anthony

12   Benedosso, Jr., B-E-N-E-D-O-S-S-O.  I'll get into remorse and

13   things like that when I close out, but just again,

14   Mr. Benedosso was the largest individual involved and he

15   received 17 and a half percent back and had $15,160 repaid.

16   Again, it just shows the pattern that my intention was to

17   repay, and obviously things were frozen because of the ongoing

18   criminal --

19             THE COURT:  Because of -- oh, a little louder.

20             THE DEFENDANT:  Yes, Your Honor.

21             My next victim impact statement is Krista Greene,

22   K-R-I-S-T-A G-R-E-E-N-E.  My only objection is that I never

23   discussed any kind of investment with Ms. Greene.  She was

24   engaged to or in relationship with Anthony Benedosso, Jr., whom

25   I just mentioned.  And as far as I'm aware, Mr. Benedosso took

**SENTENCING**

1    it upon himself to wire funds from her account to mine.  It

2    doesn't change -- I'm not arguing against the loss amount, but

3    I'm just -- it says that I preyed on her emotionally vulnerable

4    state upon her learning that she was pregnant, stuff that I

5    wasn't truly aware of, and I just object to that because it

6    makes me come off as quite predatory when it was -- I'm not

7    disputing that I owe Miss Greene money but, rather, the

8    predatory --

9              THE COURT:  The situation.

10             THE DEFENDANT:  The situation.

11             My next victim impact statement I object to just for

12   the record is Ms. Jill Barry, B-A-R-R-Y.  Again, it wouldn't

13   trouble me if the government didn't put in her sentencing

14   memorandum but they quoted her as, quote, "Andrew and Angela

15   spent a lot of money on elegant gifts" --

16             THE COURT:  That was Andrew and Angela?

17             THE DEFENDANT:  Yes, Your Honor, my wife.

18    -- "including her engagement ring, as well as visiting over

19   200 countries in the two years they were dating."

20             Traveling to 200 countries, obviously I would be in

21   the Guinness Book of World Records, but, again, also the

22   allegation that I'm buying lavish jewelry is unfounded.  I

23   could prove to the Court that I had sold jewelry I inherited

24   from my mother to pay for my wife's engagement ring, and it's

25   just unsubstantiated exaggerated thing that the government

1    would even quote such an obviously false quote in their

2    sentencing memo.  Troubles me.

3           As I mentioned in my memorandum, I just expect to be

4    sentenced fairly, proportionally and on the facts, Your Honor.

5    And the exaggerative stuff, I just -- I don't -- I mean this

6    fraud was so bad and horrible, and obviously I regret my

7    involvement.  I feel like there should be plenty for the

8    government factually to attack me on here instead of gross

9    exaggerations like visiting 200 countries in two years.

10          My next victim impact statement would be Anthony

11   Benedosso, same spelling, B-E-N-E-D-O-S-S-O, Sr.  Again, the

12   government quoted his speculation that had the FBI not

13   intervened and acted when it did, I would still be attempting

14   to deceive and cheat potential victims or that I never

15   expressed remorse.  I obviously haven't yet had the opportunity

16   to express remorse.  But Mr. Benedosso paints the picture that

17   his son, Anthony, my friend at the time, left law school

18   because of this.  I have conversations even where Mr. Benedosso

19   said that was not the issue, that he just felt he didn't want

20   to be a lawyer, and plus he also had -- was faced with

21   unexpected parenthood.  I mean, it doesn't change what

22   happened, but I just feel that, again, it paints a negative

23   picture that's not quite true to the facts.

24          My further objections would just be for the

25   restitution hearing, Your Honor, just amounts owed.  And will I

**SENTENCING**

1   have another chance then, will I --

2          THE COURT:  Yeah.  I'll let you do, as you said, your

3   closing allocution with regard to culpability and remorse --

4          THE DEFENDANT:  Okay.

5          THE COURT:  -- after Miss Oberg responds to your

6   statements.

7          THE DEFENDANT:  Thank you, Your Honor.

8          THE COURT:  Sure.

9          MS. OBERG:  Thank you, Your Honor.

10         I don't know exactly where to start here.  First, I'd

11  like to say that Mr. Partyka has shown himself to be a person

12  who does lie after lie after lie.  We have no reason to believe

13  a word he says, and compared to what the victims had to say, a

14  lot of which was substantiated by bank records, we took the

15  victims at their word, and if they were able to be here, they

16  would testify for the Court that what they gave -- what they

17  indicated was correct.

18         There was -- and I do want to address what Mr. Partyka

19  had to say, I think I'll use the podium, regarding Angela

20  Naseef.

21         THE COURT:  Actually pull it towards you because that

22  will help.  That's the purpose of the mic.

23         MS. OBERG:  Okay.

24         THE COURT:  Ms. Lizza keeps reminding me as I go

25  further from it to use it, and so I appreciate if you use it

1    too.

2          MS. OBERG:  Mr. Partyka originally came to the FBI in

3    Troy voluntarily upon request and gave -- began to give a

4    statement to FBI agents Christine Taylor and Dan Troccoli.

5          THE COURT:  Spell Troccoli, please.

6          MS. OBERG:  T-R-O-C-C-O-L-I.

7          THE COURT:  Thank you.

8          MS. OBERG:  And when he ended the interview, he left

9    voluntarily.  He realized that the -- I think that the FBI knew

10   more than he thought they knew and that they were not going to

11   be fooled by misrepresentations, and he just ended the

12   interview, which is his perfect right.

13         After that I began to get e-mails from Mr. Partyka,

14   which I've copies of if the Court would like them.  I've given

15   them --

16         THE COURT:  You have them.  You can just take the

17   parts that you want from them to talk about and...

18         MS. OBERG:  And basically Mr. Partyka was, in my

19   opinion, doing a lot of stalling, "I'm getting a lawyer, I'm

20   thinking about getting a lawyer, I've hired a lawyer."  Anyway,

21   we decided to charge him in a complaint and get him a lawyer,

22   and he had Andrew Wise initially.  He replaced Mr. Wise with

23   Mr. Eric Nemeth.  He retained Mr. Nemeth and eventually let

24   Mr. Nemeth go and began to e-mail me again that he was going to

25   hire Steve Fishman, which eventually he did.

```
 1              At -- prior to indictment we decided that Ms. Angela
 2    Naseef, who was not married at that time, was probably duped,
 3    was probably used by Mr. Partyka to insulate himself from his
 4    fraud and used her to negotiate checks, used her bank accounts
 5    to negotiate checks.  So I subpoenaed her as a witness, not a
 6    subject, and Mr. Partyka's correct, she was not a subject at
 7    that time.  Before she --
 8              THE COURT:  You mean a target?
 9              MS. OBERG:  Or a target, correct.
10              Before she was due to appear, I got a -- an e-mail
11    from Mr. Partyka on February 5th, 2013:  "Ms. Oberg,
12    Miss Naseef currently has a subpoena to testify before the
13    grand jury on Tuesday, February 12th, 2013; however, after
14    nearly five years together we were married on Tuesday,
15    January 29th.  Therefore, she will not be attending due to her
16    spousal privileges codified under Rule 501.  I'm in the process
17    of retaining Steven Fishman to handle my matter going forward.
18    Once he and I have handled our loose ends, he will contact you
19    to inform you of such.  In the meantime, I remain available to
20    you if need be.  Regards, Andrew Partyka."
21              Based upon Miss Naseef's marriage and Mr. Partyka's
22    declination to waive marital privilege, based upon records,
23    we've decided she's a conspirator, she's not duped as much as
24    we thought.  And if the Court will recall the initial
25    indictment that was returned in March 28th, 2013, we laid out
```

1  for the grand jury all of Ms. Naseef's participation.  She was

2  an incorporator in Rosebud Capital.  They opened accounts at

3  Bank of America with them as signatories in the name of Rosebud

4  Capital.  They had a business economy checking account.  They

5  were both signatories on that account.  They had a business

6  interest maximizer account.  Mr. Partyka was the only signatory

7  on that account.  He was listed as president of Rosebud on the

8  opening documents.  They did have multiple bank accounts.

9  Angela Naseef also established a Bank of America checking

10  account, and the conspirators -- we believed they were

11  conspirators at that time -- used that account in furtherance

12  of their scheme.

13          They solicited funds from her family, her friends,

14  from his family, his friends and their acquaintances, and based

15  on that we believed Ms. Naseef was a participant in the crime,

16  and the original indictment indicates further that Angela

17  Naseef drafted checks on occasion payable to the victim

18  investors on a Bank America account that were sent to the

19  victims, and the checks bounced or they were NSF and on and on

20  and on.  So she did have an active role in the scheme, but

21  after she was indicted, she had retained counsel whose name

22  escapes me at the moment, but in any event --

23          THE COURT:  Szydlak.

24          THE DEFENDANT:  Yes, Pamella Szydlak.

25          THE COURT:  Szydlak.  Is it S-Y-D-L-A-K?

1              MS. OBERG:  I believe that's right.  S-Z-Y-D, I think.

2         But in any event, they came in with a *Kastigar* letter,

3    and Miss Taylor and --

4         THE COURT:  K-A-S-T-I-G-A-R.  Okay.

5         MS. OBERG:  We interviewed Miss Naseef who we decided

6    after that candid interview was, in fact, duped by Andrew

7    Partyka, was used by him.  And at that point I knew there

8    wasn't a conspiracy.  And when Mr. Fishman indicated

9    Mr. Partyka was interested in a plea offer, I drafted an

10   information charging him, rather than with conspiracy, with

11   Count 1 of -- one count of mail fraud.

12        So I just wanted to lay that out for the Court to

13   allay any concerns the Court might have that were raised by

14   Mr. Partyka in his memorandum.

15        In addition, his e-mails, if the Court wishes to see

16   them, he indicates in his memorandum that he continued to make

17   offers to plead guilty, he made offers to me, I called him

18   arrogant.  Never made an offer to me to plead guilty, and I

19   never called him arrogant.  I don't know who told him that.

20        His only e-mails to me are delay, delay, delay, I'll

21   get a new lawyer, I'll do this, I'll do that.  That's all they

22   are.  I gave them to Mr. Fishman, and I'm happy to give them to

23   the Court.

24        We never prevented him from paying restitution.  We

25   never insisted that he plead guilty before we would dismiss the

1    charges against his wife.  In fact, the Court will recall that

2    at the first hearing we had I moved to dismiss the indictment

3    as to Miss Naseef.  And the Court asked, "Should we wait till

4    Mr. Partyka is sentenced?"  I said, "No, Your Honor, I think

5    the circumstances require it to be dismissed now," because we

6    no longer believed that she had culpability.

7         He has been given full discovery, or at least

8    Mr. Fishman was, all the witness 302s, all the bank records

9    that support the allegations that the victims made about

10   bounced checks, about them giving contributions or thinking

11   they were making investments.  He held himself out to them as a

12   person who was a very successful investor.  He told them that

13   he had gone to Georgetown, got bored there because it was too

14   easy for him, went to Harvard, met Mark Zuckerberg, they became

15   friends, he helped Mr. Zuckerberg incorporate Facebook, he's a

16   6 percent owner of Facebook and on and on and on, all of which

17   were lies.

18        Mr. Partyka never graduated from high school, which he

19   admitted to the FBI in his initial interview, which he denied

20   to probation.  They were unable to find that he had graduated

21   from the military academy he said he did, and now in his

22   memorandum he's saying, once again, that he did graduate from

23   there and is an educated person.

24        Clearly, he's a bright man, no question about that.

25   But he is unable to tell the truth and happy to take people's

1   money under false pretenses.

2       I think that the victims' statements speak very well

3   of what actually happened in this case. They are eloquent.

4   They have the ring of truth. And they indicate that

5   Mr. Partyka totally lied to them, took their money, made

6   promises to them. By the way, the list of places that my memo

7   says that the two, Partyka and Naseef went, was given by

8   Miss Naseef to Pretrial Services. That's not a list that

9   materialized out of the air.

10      He says he has, on page 7 of his memorandum, he has no

11   intent to ever commit a crime. A lie after a lie after a lie,

12   taking money from everybody who's willing to give it to him,

13   false pretenses. Anthony Benedosso, Jr., said that he

14   showed -- Mr. Partyka showed him a xerox copy of a check

15   purportedly from the Meijer family company, Meijer store

16   family, for $10 million that he had used to invest, and that

17   was completely untrue. He never had a penny from the Meijer

18   store family that we found in any accounts.

19      In his statement here he says that when his mother

20   passed away, he inherited a million dollars which he gave away

21   in full to charity. If that's correct, he should have used it

22   for restitution to these victims. I don't believe it for a

23   minute.

24      Pretrial Services -- the probation report says that

25   his mother had filed charges against him for beating her and

**SENTENCING**

1    eventually they were dismissed because she withdraw her

2    complaint.  But he says in his memo, "No, she was trying to

3    commit suicide and I had to get rough with her to stop her."

4    Those are lies, Your Honor.

5         I can go on.  I don't know that I need to.  I could

6    refute every statement that he's made in his sentencing

7    memorandum.  But I submit to the Court that this sentencing

8    memorandum and Mr. Partyka's statements here today indicate to

9    me that he has lied to the Court, lied to the probation

10   department, misrepresented his background, his intention.

11   Saying that the government prevented him from paying

12   restitution is widely untrue.  We never had any discussions

13   about that.  We'd have been thrilled if he had paid

14   restitution, and I'm sure the Court would have taken that into

15   account if he had.

16        But I think that in light of that, the Court may wish

17   to consider not giving him acceptance of responsibility credits

18   which the Court could do under the Rule 11 plea agreement.

19   Page 5 of the plea agreement says "If the Court finds," and it

20   goes on to the next page, "that the offense level should be

21   higher because after pleading guilty, Defendant made any false

22   statement to or withheld information from his probation

23   officer, otherwise demonstrated a lack of acceptance of

24   responsibility for his offenses or obstructed justice or

25   committed any crime, and if such finding results in a guideline

1    range higher than is recommended by the parties, then the

2    higher guideline range becomes each party's recommended

3    guideline range."

4           I know the Court has gone down two levels because

5    of -- by taking the restitution amount rather than the fraud

6    amount, which I understand, but I suggest that the Court can go

7    back up three levels and take away acceptance of

8    responsibility.  Yes, he pled and saved the government the

9    expense of a trial, but he was not registered with the SEC

10   which he represented he was, taking people's money without any

11   authority whatsoever, using it for whatever purposes he decided

12   were appropriate, lulling them with e-mails claiming the

13   government was keeping him from fulfilling his promises to

14   them.  And I hope that the Court gives Mr. Partyka all the time

15   that you can.

16          Unless the Court has questions.

17          THE COURT:  Nope.

18          MS. OBERG:  Thank you.

19          THE COURT:  Mr. Partyka, if you want to allocute.

20          MS. OBERG:  Sorry.  I left my pen.

21          THE DEFENDANT:  Your Honor, do I have the ability to

22   respond at all to some of these allegations the government just

23   said --

24          THE COURT:  Yeah.

25          THE DEFENDANT:  -- are a little troubling and not --

1    they're arguing for a sentencing enhancement, so am I able to

2    respond?

3              THE COURT:  Sure.

4              THE DEFENDANT:  This is the list, Your Honor, that was

5    just produced by the government.  All these people highlighted

6    in yellow -- I'm not aware if your vision is that great.

7              THE COURT:  I can see.  I just look old.

8              THE DEFENDANT:  -- are not owed money or what -- or

9    the amount is inaccurate.

10             So if the government's attacking my credibility, I

11   remind the Court that they're seeking to have me imprisoned,

12   second to the loss of life, the most severe thing the U.S.

13   government can do, based off completely inaccurate amounts.  So

14   the benefit of the doubt, I would assume, naturally benefits

15   me.  But when the government is calling for a term of

16   imprisonment or saying I don't show remorse and this is how

17   inaccurate it is, I'm -- I think that says a lot, Your Honor.

18             The government also -- my e-mails that Miss Oberg read

19   into the record show that I was taking it seriously.  I did not

20   want her to think that I was ignoring the government or trying

21   to delay.  I have not tried to delay this at all.  It's gone on

22   for 16 months.  As you know, criminal cases take awhile.

23   Delay, I've gained 80 pounds.  It's not been fun.  It's been

24   extremely stressful.  My e-mails to her were simply to show

25   that I was taking this matter seriously.

```
 1            Also, as I've mentioned in my sentencing memorandum, I
 2    at the time thought logic would prevail, and what attorneys
 3    were asking for retainers rivaled the amounts of the alleged
 4    fraud.  And I was trying to prevent spending unnecessary
 5    amounts in legal bills, and that's what those e-mails reflect,
 6    is the debate I was having, versus, you know, repayment or
 7    restitution.
 8            The government also says that I had no -- they didn't
 9    prevent me from making restitution, which is true, but how do I
10    make restitution, Your Honor, when the amounts still aren't
11    agreed to, are vastly wrong?  And if not even for me, it's
12    unfair to the people who are truthfully owed money when other
13    people, like Mike and Grace Naseef, N-A-S-E-E-F, were on the
14    list for $20,000 owed when it wasn't even $20,000 of a
15    transaction ever?
16            It's not I'm arguing with the government of $50 or
17    $100.  We're arguing about financial transactions that never
18    occurred.  So either the government has, you know, the --
19    investigation's part of the FBI's name, but it appears that
20    they didn't check the veracity of any of these things, and that
21    to me is a severe credibility issue because they're trying to
22    have me imprisoned based off of that.
23            Also, I, on advice of counsel, you know, returning
24    vast sums of money in the middle of a criminal investigation, I
25    could easily be sitting before Your Honor here today charged
```

1  with obstruction or something else, it was -- without Court
2  supervision it would be, in essence, reckless for me to make
3  any restitution attempts, not to mention the fact that amounts
4  haven't been involved.  If that's the government's argument, I
5  would ask them to call me on my bluff, delay sentencing, come
6  up with an amount today while we're all here and give me an
7  opportunity to make restitution.
8          Again, based off of no fact, the government takes
9  issue with the sentencing -- my sentencing memorandum.
10 Everything I put in this, Your Honor, is easily verifiable and
11 I could easily chop away the credibility of the government with
12 people who are just in the courtroom today.
13         But this thing with my mother, besides being
14 irrelevant, Miss Oberg was not there, it only occurred between
15 my mother and I.  A family friend is in the court today who's
16 known my mother since, obviously, before I was born.  My mother
17 died two months after that incident and I did inherit a million
18 dollars.  The false option of -- from her estate, that I could
19 use it towards restitution.  Well, my mother died in 2007,
20 seven years ago this month.  So that's kind of an unnecessary
21 jab.  But even for the government to speak that they would be
22 aware of the factual proceedings of that incident that occurred
23 between my mother and I is completely just unnecessary personal
24 jab, and I feel that the government has made this personal and
25 is not acting in the best interest of all involved.

**SENTENCING**

```
 1              I've accepted responsibility, Your Honor.  I -- I'm
 2    here before you.  I'm trying to do what's right.  I can easily
 3    prove that the amount of the alleged fraud, presumably under
 4    $400,000, I've spent 80 percent of that on legal bills today.
 5    The indictment of my wife cost a substantial sum of money.  The
 6    government simply, Your Honor, is not acting in a way that
 7    benefits anyone.  And if I need to be punished, that's fine.
 8    I'm young.  I'm not going anywhere.  But it's a false option if
 9    I -- when there's no amounts and no accurate list of people
10    involved, at this stage in the game, Your Honor, after 16
11    months it's disingenuine.  If the government wants to call
12    their bluff, that's fine.  I welcome it.  But Mr. Gregory
13    Kosmatka --
14              THE COURT:  Who?
15              THE DEFENDANT:  Gregory Kosmatka, K-O-S-M-A-T-K-A.
16              THE COURT:  Thank you.
17              THE DEFENDANT:  -- could immediately just refute the
18    state of my mother.  I'm taking that personally because for a
19    federal prosecutor to argue that what occurred between two
20    people seven years ago is just unnecessary.  It's not a lie.
21    He could vouch under oath right now that my mother had lost
22    business, everything --
23              THE COURT:  I'm not going to take that into
24    consideration --
25              THE DEFENDANT:  All right.  I'm just --
```

**USA v. PARTYKA, 13-20243**

**SENTENCING**

1          THE COURT:  -- at sentencing.

2          THE DEFENDANT:  You know, the bar is extremely high,

3    Your Honor.  The Bill of Rights, most of them deal with the

4    rights of the accused in this country, and that the government

5    literally at the sentencing hearing is wasting time on this is

6    troubling.  And if I could just read a quote from Miss Oberg's

7    boss, high up the chain, the Deputy Attorney General of the

8    United States --

9          THE COURT:  Mr. Cole?

10         THE DEFENDANT:  Mr. Cole.  I think it's extremely

11   relevant to this case.

12         THE COURT:  Slowly.

13         THE DEFENDANT:  Yes, sir.  He said, quote --

14         THE COURT:  Slowly.

15         THE DEFENDANT:  Yes, sir.  "In a criminal case, I have

16   to prove not only that you made a false statement" --

17         THE COURT:  Wait.  See, you got to slow down or you're

18   going to sit down.  You have a right, but you can't abuse the

19   court reporter.

20         THE DEFENDANT:  I apologize.

21         THE COURT:  Okay.  "In a criminal case."

22         THE DEFENDANT:  "In a criminal case I have to prove

23   not only that you made a false statement but that you intended

24   to commit a crime and also that the other side of the

25   transaction relied on what you were saying.  And, frankly, in

**SENTENCING**

```
 1   reality you had very sophisticated counter parties on both
 2   sides."  This was in reference to a lack of prosecutions from
 3   the financial frauds of Wall Street.  "And so even when one
 4   side may have said something was dark blue, when really we can
 5   say it was sky blue, the other side of the transaction, the
 6   other sophisticated party, wasn't relying at all on the
 7   description of the color."
 8           And the government -- and the relevance of this is the
 9   government is not proving that these exaggerations and lies,
10   anybody resulted in it.  They keep bringing up, out of this
11   whole fraud, this $10 million check from Meijer.  Well, if I
12   sent a xerox copy, don't you think the individual would have
13   saved it because it would have been noteworthy or it would have
14   been able to be produced?
15           THE COURT:  Slow down.  Last warning, slow down or
16   you're going to sit down.
17           THE DEFENDANT:  I apologize.
18           THE COURT:  Okay.  Let's get -- I'm not going to
19   consider that --
20           THE DEFENDANT:  Okay.  Your Honor.  So just attack on
21   the credibility of that.  I appreciate that.
22           If I could allocute for my final --
23           THE COURT:  Okay.  Slowly.
24           THE DEFENDANT:  Yes, Your Honor.
25           I didn't write prepared remarks for that, but I am
```

1    sorry for my involvement.  Most of these individuals were all

2    friends or someone I knew; therefore, you know, I would never

3    deliberately hurt anyone.  Almost everyone can attest that I

4    always said, you know, I wouldn't take an amount of money I

5    couldn't make right.  I can argue, but that's not what I'm

6    trying to do, that this was not deemed traditional investments

7    for most people.  Alleged victims contacted family members of

8    mine, harassed my wife at work.  I don't know many people who

9    call their stockbroker's wives or sisters or uninvolved

10   parties.  The reason so many people for such a small amount are

11   involved in this matter is because I only took from people what

12   I could make right.

13          If -- I just ask the Court to consider that if the

14   government, minutes before sentencing, can't even produce an

15   accurate list or -- of people involved, that they haven't even

16   attacked motive or what I was actually doing.  I have a family

17   and friends who I could have taken a million dollars from and

18   the sentencing guidelines would have benefitted me, as opposed

19   to countless individuals for smaller sums of money.  I would

20   love an opportunity to make things right.  I am truly sorry.  I

21   accept responsibility.

22          In terms of a punishment, I argued, I think, that, you

23   know, if a company like Chase can get deferred prosecution, it

24   should be eligible here.  While I don't think the Court will

25   entertain that, I think a reasonable outcome for everyone would

```
1   be a sentencing delay contingent on repayment provided an
2   amount can be agreed to.
3          Felony conviction for me will be onerous for the rest
4   of my life.  It shuts off a lot of opportunities to me.  I've
5   always been civically engaged.  Losing the right to vote is a
6   big deal to me.  It closes off fatherhood to me, as I can't
7   adopt a child.
8          And obviously, if I live for a natural life span, it
9   will be difficult for decades to come absent a term of
10  imprisonment.  And I understand guidelines call for
11  imprisonment, but I'm at a crucial age in my life that a
12  substantial term, especially what the government is calling
13  for, would be ruinous to my marriage and damaging to my family.
14         I know that my credibility can be attacked, but I
15  believe I reasonably display some level of intelligence.  And
16  if I was really intending to defraud, I don't think this is a
17  great argument, there would be a lot more zeros involved.  It
18  was not my intention.  It benefitted me in no way.  It's
19  obviously been damaging to me, and I'm so remorseful for that.
20  I'm just troubled that I've got to have an opportunity to make
21  things right, and I've yet to -- just the facts of the case, to
22  be sentenced truthfully have not been agreed to.  I just -- I
23  think this is a classic example of a case that could,
24  potentially, the Court could compel a solid outcome for and
25  then assess punishment from there.
```

```
 1          As mentioned, I can prove that I spent a vast amount
 2  of legal bills that rivals the amount owed.  I had access to
 3  millions of dollars through family and friends, none of them
 4  were, you know, involved in this and it would have been
 5  beneficial if they were.  I displayed, a, you know, no
 6  eagerness for amassing wealth in my life.  I can prove I gave
 7  away my mother's estate to charity.  I really didn't benefit
 8  any way.  I know you don't have to prove that all crime's
 9  beneficial for mail fraud.  But I just -- the government has
10  clearly been operating for a long time off of exaggerated
11  amounts, wrong facts, wrong people involved, probably egged on
12  by that, and if common sense had prevailed long ago, this could
13  have been resolved.
14          What Miss Oberg -- I would love to see the e-mail
15  perhaps, but I had mentioned an e-mail January of last year
16  that any amount in question would be quickly rivaled to legal
17  bills, that if she would work out a plea with me, I would
18  retain an attorney for the sole purpose of a plea bargain.  I
19  believe I could produce that e-mail saying that.
20          MS. OBERG:  I have the e-mails right here.
21          THE DEFENDANT:  May I please have just a second to --
22          THE COURT:  Sure.
23      (Short pause.)
24          THE DEFENDANT:  I don't see it in this e-mail.  That
25  doesn't mean it doesn't exist, but I'll withdraw the argument.
```

**SENTENCING**

```
 1              THE COURT:  Okay.

 2              THE DEFENDANT:  But my intention was --

 3              THE COURT:  Loud and slow.

 4              THE DEFENDANT:  Yep.  But my intention was, Your

 5    Honor, to potentially -- I believe I did mention in an e-mail

 6    that I would retain a plea bargain -- an attorney who

 7    specializes in plea bargains.

 8              Like I said, I'm deeply sorry.  I'm 28 years old.

 9    This will have a disproportionate effect on the rest of my life

10    no matter what.  I at the very least would love an opportunity

11    to make this right.  As you could probably reasonably agree,

12    the amount of restitution is not something that is an

13    unimaginable amount that I would make in my lifetime.  The

14    probation department for their presence report cited a

15    judgment the IRS has on me that transferred from my mother to

16    me, but it proves that I made a 1,900 percent return, over a

17    million dollars trading for my mother, at the age of 17.  So I

18    guess whether exaggeration -- I never even quoted that to

19    anybody.  But I did well and I will do well for my life and

20    regardless, I hope, and the option of repayment is pretty

21    reasonable in this case, and I just ask that the Court take

22    that into consideration.  Even given menial employment, I would

23    almost be able to make restitution.

24              This has consumed 16 months from start to finish

25    today.  I'm, like I said, I'm going nowhere.  I've successfully
```

1   complied with pretrial.  I'm not seeking to withdraw my plea.

2   Even after inadequate counsel, because the discovery that

3   Ms. Oberg cited was never given to me by Mr. Fishman --

4           THE COURT:  Wait.  We've gone through that.

5           THE DEFENDANT:  It was never provided --

6           THE COURT:  Okay.  Slow.

7           THE DEFENDANT:  And so that's all I ask, is for mercy.

8   I've lived a pretty good life taking care of people.  There's

9   always two sides to every story.  There's a lot more I could

10  argue and debate, but from victim impact statements to

11  credibility of the government.  I think the government has

12  shown by quoting people who aren't even owed money as an

13  argument to imprison me that what they say should be

14  skeptically considered, if at all.  The bar is high for the

15  federal government.  It's troubling that they have no respect

16  for facts or what's really happened.

17          THE COURT:  Right.  You have stated that.

18          THE DEFENDANT:  And I close on that with remorse and

19  hope that the Court can compel an outcome that's beneficial to

20  all involved --

21          THE COURT:  Okay.

22          THE DEFENDANT:  -- that I may be sentenced fairly.

23  Thank you, Your Honor.

24          THE COURT:  You can stay there.

25          Miss Oberg, why don't you go side bar.

1         Court has --

2         MS. OBERG:  Can I just respond to one thing, Your

3    Honor?

4         THE COURT:  No.

5         MS. OBERG:  Thank you.

6         THE COURT:  The Court has before it the sentencing of

7    Mr. Partyka.  The guideline range is 30 to 37 months.  It's an

8    advisory guideline range.  Among the factors the Court is to

9    take into account at sentencing are the nature and

10   circumstances of the offense, and this is a serious fraud

11   offense.  The history and characteristics of the Defendant.  He

12   does not have any prior conviction, and I will allow the

13   acceptance of responsibility point reduction of three points

14   which, again, still creates the range of 30 to 37 months and

15   does not raise the range which would occur if I denied those

16   three points.

17        There is a need for the sentence to reflect the

18   seriousness of the offense, promote respect for the law,

19   provide just punishment, afford deterrence to criminal conduct

20   and, indeed, to protect the public from further crimes of the

21   Defendant.

22        He took money from close friends, family,

23   acquaintances.  He took the money that they had.  The fact that

24   they weren't real wealthy meant that he got less than some of

25   the larger fraud schemes, but that factors into lower guideline

1   range in terms of the lesser amount of money involved in the

2   scheme.   There is a need to protect the public, I believe, from

3   further crimes of this Defendant.

4          Taking these facts into consideration, and the fact

5   that this was, as most frauds, this was based on greed and not

6   being a good friend to friends, not being a good relative to

7   relatives, pursuant to the Sentencing Reform Act, 1984,

8   considering the guidelines, the factors contained in 3553(a),

9   commits the Defendant to the custody of the Bureau of Prisons

10   for 36 months.   Upon release from imprisonment, Defendant shall

11   be placed on supervised release for a term of three years.

12   Further ordered special assessment of $100 due immediately.

13   The Court waives imposition of a fine, costs of incarceration,

14   costs of supervision due to Defendant's lack of financial

15   resources.   Defendant shall pay -- we'll deal with the

16   restitution in a month or so.

17          While in custody, Defendant shall participate in the

18   inmate financial responsibility program, and mandatory drug

19   testing is not required.   While on supervision, he should abide

20   by the standard conditions adopted by this Court and the

21   following special conditions.   There will be an outstanding

22   restitution obligation.   So he should provide the probation

23   officer access to requested financial information, make monthly

24   payments.   Defendant should not go to any gambling institutions

25   or computer gambling, and he's prohibited from entering

```
 1    casinos, horse tracks.  And he should also engage in full-time
 2    employment which is 40 hours of employment a week.
 3            Are there any objections to the sentence just
 4    pronounced that have not previously been raised, Mr. Partyka?
 5            THE DEFENDANT:  I was just wondering if --
 6            THE COURT:  I will allow to report when designated.
 7            THE DEFENDANT:  Okay.  I mean, Court influence is
 8    minimal, but instruct the BOP something east of the
 9    Mississippi, north of the Mason-Dixon line?
10            THE COURT:  Okay.  You're obviously well aware of the
11    Court's relationship with the Bureau of Prisons.  I will
12    request that, but they are in control based on security and
13    occupancy, so I will do that.
14            THE DEFENDANT:  And will I have time to get my affairs
15    in order?
16            THE COURT:  You will probably have a month or so.
17            THE DEFENDANT:  And we'll schedule a restitution
18    hearing?
19            THE COURT:  We will, yep.
20            THE DEFENDANT:  And there's just no chance of being
21    able to lower this amount?
22            THE COURT:  No.
23            Miss Oberg, are there any objections to the sentence
24    just pronounced that have not previously been raised?
25            MS. OBERG:  No, Your Honor.  Thank you.
```

```
 1            THE DEFENDANT:  Thank you, Your Honor.
 2            THE COURT:  And I accept the Rule 11 plea agreement.
 3            MS. OBERG:  Thank you.
 4            THE COURT CLERK:  Please rise.  Court is adjourned.
 5         (Proceedings concluded, 10:15 a.m.)
 6                          -   -   -
 7                    CERTIFICATION OF REPORTER
 8
 9      I, Leann S. Lizza, do hereby certify that the above-entitled
10    matter was taken before me at the time and place hereinbefore
11    set forth; that the proceedings were duly recorded by me
12    stenographically and reduced to computer transcription; that
13    this is a true, full and correct transcript of my stenographic
14    notes so taken; and that I am not related to, nor of counsel to
15    either party, nor interested in the event of this cause.
16
17
18    S/Leann S. Lizza                          2-13-14
19    Leann S. Lizza, CSR-3746, RPR, CRR, RMR        Date
20
21
22
23
24
25
```